**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CLARENCE GOODIN,**

        **Plaintiff,**

**-vs-**          **Case No. 6:04-cv-877-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

**ORDER**

This matter came before the Court for consideration without oral argument on the complaint filed by Clarence E. Goodin seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"), and a supplemental transcript containing the transcript of a hearing held on May 14, 2003. Doc. Nos. 10 - 13. The matter has been referred to me for disposition pursuant to the consent of the parties. Doc. Nos. 14, 16.

**I.      PROCEDURAL BACKGROUND.**

In September 1997, Goodin applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and the Supplemental Security for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.*, (collectively the Act). R. 69-71, 380-81. The applications alleged that

Goodin became disabled on November 2, 1990.[1]  *Id*.   The SSA denied Goodin's applications both initially and on reconsideration. R. 56-57, 61-62, 386-87, 390-91.

Goodin made a timely request for a hearing by an administrative law judge ("ALJ").  An ALJ held a hearing on June 7, 1999, at which Goodin, who was represented by an attorney, and James LeMay, one of Goodin's friends, testified.  R. 29-51.

On October 15, 1999, the ALJ issued a decision denying Goodin's claims.  R. 17-24.  Goodin requested review of the ALJ's decision, which request was denied by the Appeals Council.  R. 6-7.  Thereafter, Goodin filed an action in this Court.  *Goodin v. Barnhart*, 6:01-cv-434-Orl-18KRS, Doc. No. 1.  The Commissioner moved for remand so that the ALJ could solicit the testimony of a vocational expert ("VE").  On April 16, 2002, this Court granted that motion and reversed the decision under sentence four of 42 U.S.C. § 405(g).  R. 427-29.

Following remand, the ALJ held a supplemental hearing at which Goodin, who was again represented by an attorney, and Jane Beougher, a VE, testified.  R. 487-525.  On June 9, 2003, the ALJ issued a decision denying Goodin's applications for benefits.  R. 425A-425K.[2]

The ALJ determined that Goodin was insured under OASDI through December 31, 1994.  R. 425E.  He concluded that Goodin had not engaged in substantial gainful activity since November 2, 1990, the alleged onset date of his disability.  R. 425J.

---

[1] It appears that Goodin amended the onset date to December 1994, during the supplemental hearing.  R. 490.

[2] The transcript of the proceedings before the SSA contains page 425 followed by pages 425A through 425K.

The ALJ found that Goodin had narcolepsy, a history of a traumatic injury of his right eye, and early osteoarthritis, which were impairments or combination of impairments that were severe. R. 425G, 425J. He concluded that these impairments did not meet or equal any impairments listed in the SSA regulations. R. 425G.

The ALJ determined that Goodin had the residual functional capacity ("RFC") to do the following:

> [L]ift and carry 25 pounds frequently and 50 pounds occasionally, and sit, stand or walk for 6 hours in an 8-hour workday with inability to perform activities requiring binocular vision due to blindness of his right eye and a need to avoid hazards such as working on unprotected heights or around dangerous moving machinery or to operate moving machinery
> . . . .

R. 425H. In reaching this decision, the ALJ found that Goodin's testimony was not fully credible because he exaggerated the frequency of his sleeping episodes and because he had a favorable response to medication. R. 425H.

The ALJ concluded that Goodin could not return to any of his past relevant work because it exceeded his RFC. R. 425H. Relying upon the Medical-Vocational Guidelines (the "grids"), 20 C.F.R. Part 404, Subpt. P, App. 2, as a framework, and the testimony of the VE, the ALJ determined that there was work available that Goodin could perform. He specifically identified these jobs as cleaner, waiter, food and beverage order clerk, and hand packer, each of which existed in significant numbers in the national economy. R. 425I. Accordingly, he concluded that Goodin was not disabled. R. 425J.

Goodin requested that the Appeals Council review this decision.  On April 2, 2004, the Appeals Council denied the request for review.  R. 402-04.  Goodin timely sought review of the Commissioner's decision in this Court.

**II.     JURISDICTION.**

This Court has jurisdiction under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

**III.    STATEMENT OF FACTS.**

*A.     Testimony of Goodin and LeMay.*

Goodin was born on November 23, 1949.  R. 33.  He attended school through the tenth grade.  *Id*.  He described his ability to read and write as average.  He could, for instance, read a newspaper article.  R. 33-34.  He could also read the Bible.  R. 501.

Goodin previously worked in construction, as a pipefitter and a heavy equipment operator.[3]  He also worked in maintenance at a fast food restaurant[4] and elsewhere.  R. 35, 503-04.  Goodin was incarcerated from 1989 through 1997.  R. 34.  During his incarceration, he worked on an inside ground crew doing raking.  R. 40.  He also was part of a work camp where he was assigned to pick up paper from highways.  R. 40.  Additionally, he worked as a houseman cleaning bathrooms and the dormitory.  R. 42.

---

[3] A Termination Slip in the record reflects that Goodin was terminated from his job in March 2003 because he was not safe around heavy equipment and was at a risk for personal injury.  R. 444.

[4] Goodin's supervisor at this job wrote that Goodin would fall asleep washing dishes and while waiting in the teller line.  R. 445.

Lemay, who was incarcerated with Goodin, testified that Goodin worked slowly and did not always understand what to do. Goodin also fell asleep from time to time. R. 48-50.

Goodin had had narcolepsy since at least 1987. R. 35-36, 493. When his tongue became dry, that was a signal that he was going to fall asleep. R. 37. He would stay asleep from between two to twenty minutes. R. 36-37. He estimated that he had had three sleeping episodes the day before the first hearing before the ALJ. R. 37. He fell asleep during the jobs he was assigned while incarcerated. R. 40-43. On one occasion as a result of falling asleep, he fell and hit his head. R. 39, 496.

He also was blind in his right eye since age thirteen. R. 37-38, 497. He experienced pain in his right eye. R. 507. His vision was impaired in his left eye, and he used reading glasses. R. 498. He could see the ALJ, who was sitting about ten to fifteen feet in front of him at the hearing, but his face was blurry. R. 516. He could see writing on a paper held about one foot from him, but he could not read it. R. 517.

He also had pain in his left wrist. R. 498-99. He had previously had an operation on his right wrist. R. 499.

In about 1994, he was prescribed Dexedrine for his narcolepsy, although he could not use it consistently until he got out of jail. R. 43-44. He had fewer sleeping episodes when he was taking his medicine. R. 45.

Goodin estimated that he could lift forty pounds. He could stand about thirty minutes before falling asleep. He could walk for an hour. He could sit fifteen or twenty minutes before falling asleep. R. 505.

In a normal day, Goodin exercised for about forty-five minutes. R. 501. He would attempt to do chores for himself or for his mother, including grocery shopping. R. 501-02. He tried to mow the lawn, but stopped if he felt he was about to fall asleep. R. 38. He had a restricted driving license due to his limited vision. R. 502. He did not drive because he feared that he would fall asleep. R. 45, 502. He would also visit with his cousin when he came to Goodin's house. R. 39. He was able to sleep about four hours a night. R. 497.

B.   *Vocational Expert Testimony.*[5]

The ALJ posed the following hypothetical question to the VE:

> [A]ssume that the claimant is 53 years old, and he's got a 10th grade education with a GED. And assume further that I find that he can perform medium work, and is further limited by the following non-exertional impairments. He's occasionally restricted in climbing and balancing, and should avoid heights, ladders, ropes, scaffolds, as well as moving machinery, or other hazards. Assume also, that he has loss of vision in the right eye, and is thus precluded from tasks requiring full visual acuity.

R. 514. The VE responded that this hypothetical claimant could work as a cleaner or a waiter. R. 514; *see also* R. 523-24 (number of cleaner jobs available). He could also perform the following unskilled jobs requiring a sedentary level of exertion: food and

---

[5] Goodin contends that the case should be remanded because the tape recording of the supplemental hearing is incomplete due to inaudibility of some of the VE's testimony. The inaudible portion of the transcript related to the VE's assessment of the requirements of Goodin's past work. Her assessment is also contained in the record in handwritten form. R. 446. Moreover, because the portion of the recording that is inaudible relates to the demands of Goodin's past work, and the ALJ concluded that Goodin could not perform his past work, I find that the inaudible portion of the tape recording is not relevant or necessary to the substantive issues presented by Goodin. Therefore, remand is not required based on portions of the tape recording of the supplemental hearing being inaudible.

beverage order clerk, DOT 209.567-014, and hand packager, DOT 559.687-014, which jobs existed in significant numbers in the national economy. R. 515.

In response to questions from Goodin's attorney, the VE testified that Goodin's lack of visual acuity would not impair his ability to work as a cleaner, and she believed that, with reading glasses, Goodin could also work as a waiter, food and beverage clerk and hand packager even with his vision problems. R. 518-19.

In response to cross-examination about narcolepsy, the VE observed that assuming three to four attacks lasting four to five minutes per day, the average time spent asleep would be fifteen minutes. R. 522. The VE concluded that many employers would count that as a break or would otherwise tolerate the situation, although she conceded that falling asleep could compromise Goodin's ability to perform any of the jobs she identified. R. 522-23.

*C.     Medical Evidence.*

Examination records dated June 1990, reflect that Goodin was blind in the right eye and had poor vision in his left eye. R. 285, 288. He was prescribed glasses. R. 233, 279. On July 12, 1996, Goodin's visual acuity in his left eye without glasses was 20/100 and with glasses was 20/25 with a reading acuity of 24/30. R. 157. In May 1997, Goodin complained of right eye pain causing a headache, R. 120, which complaints recurred over time, R. 113, 339.

Goodin began complaining of right wrist pain in December 1995, R. 337, which complaints recurred thereafter, *e.g.,* R. 333. An x-ray of Goodin's right hand taken on

July 24, 1996, showed mild degenerative changes.  However, x-rays of Goodin's right hand taken in October 1996, were normal.  R. 329-30.

Beginning in July 1990, Goodin complained that he was sleeping too much and could not control it,  R. 283, and these complaints continued thereafter, *e.g.*, R. 122, 218, 224, 230, 254, 272-73.  He reported dizziness with a dry mouth and blurry vision before he fell asleep.  R. 206, 209, 220, 259, 274-75, 280-81.  On October 4, 1990, Chester M. Thompson, M.D., made a provisional diagnosis of narcolepsy.  R. 281.

J. True Martin, M.D., a neurologist, examined Goodin and scheduled additional testing.  R. 276.   An EEG was normal.  R. 267.

On December 30, 1992, M.S. Nashed, M.D., examined Goodin.  Goodin complained of pain in his legs and in his left forearm, among other things.  He also reported that he was excessively sleepy.  Dr. Nashed's impression was that Goodin was anxious and depressed.  He attributed the leg pain to muscle spasms in Goodin's back. R. 265-66.

In July 1993, S. Vijay, M.D., opined that Goodin suffered from hypersomnolence and needed to rule out narcolepsy with a sleep study.  R. 253.  Hal Pineless, D.O., performed the sleep study in November 1993.  The results were consistent with narcolepsy.  Dr. Pineless prescribed Ritalin.  R. 249, 294.  Goodin occasionally refused to take Ritalin while he was incarcerated.  R. 216, 221, 229, 235-36.  In September 1994, Goodin's medication was changed to Dexedrine.  R. 217.  Records reflect that Goodin had a disciplinary report in August 1996 for sleeping at an inappropriate time.  R. 145. Dr. Pineless continued to prescribe Dexedrine through November 1996.  R. 291.

-8-

T. Thiruchelvam, M.D., examined Goodin on May 5, 1998.  R. 354.  Goodin reported that he had occasional double vision and some pain in his right eye.  R. 355.  He had good power in his arms and legs, with no atrophy.  Range of motion was within normal limits.  Repetitive muscle testing did not produce fatigue.  R. 356-57.

Nicholas H. Bancks, M.D., reviewed Goodin's records and prepared an RFC assessment in June 1998.  He opined that Goodin should never climb ladders, ropes or scaffolds and could only occasionally balance.  He should also avoid all exposure to hazards such as machinery and heights.  He had limited near and far visual acuity, depth perception and field of vision.  R. 358-65.

Dr. Pineless examined Goodin again on July 21, 1999.  Goodin complained that he was falling asleep despite use of Dexedrine.  Upon examination, Dr. Pineless observed that Goodin had good muscle strength in all extremities.  He recommended increasing the dosage of Dexedrine.  With respect to Goodin's ability to work, Dr. Pineless wrote as follows:

> As far as the issues of work are concerned, it is pretty clear that given the way the patient is right now he is incapable of working. He certainly can not drive a car and can not work with heavy equipment. However, my experience has been that people with narcolepsy who are treated properly and are compliant with their medication are able to be gainfully employed.  Therefore, I think it is reasonable to assume that Mr. Goodin if motivated to get better should be able to be employable in the future.  If he was extremely well controlled he may even go back to using heavy equipment and driving.

R. 374.

Dr. Pineless also prepared an RFC form.  He opined that Goodin could sit eight hours, stand or walk seven hours, and work zero to one hour a day.[6]  He could operate foot controls expect during a narcoleptic attack.  Climbing would also be dangerous during a narcoleptic attack.  Goodin could not tolerate exposure to unprotected heights, being around moving machinery, or driving automotive equipment.  These are the only limitations Dr. Pineless noted.  R. 375-78.

Goodin was treated at Halifax Crosslin Health Center from about June 1999, through May 2003.  R. 456-71.  Goodin reported on May 3, 2001, that he was still falling asleep.  R. 467.  On November 11, 2001, Goodin indicated that he had not had his previous prescription refilled.  He reported that he had fallen asleep while riding a lawn mower and ran into a house.  His prescription for Dexedrine was renewed, and he was warned not to operate hazardous machinery.  R. 465.  His next examination was not until May 17, 2002, although he reported having seen another doctor in the interim.  R. 464.  Goodin indicated that he would still fall asleep if he sat down to rest.  *Id*.  In June 2002, Goodin stated that he was still falling asleep easily, but not as often as previously.  R. 462.  On October 24, 2002, Goodin reported that he was doing well on Dexedrine and had reduced his dosage to only one pill instead of two.  R. 460.

---

[6] Dr. Pineless completed two RFC forms, both dated the same day, but with slightly different entries.  *Compare* R. 375-76 *with* R. 377-78.   In the first form, Dr. Pineless wrote in the remarks section: "Patient with narcoleptic symptoms since 1987. Diagnosed with narcolepsy in 1993 via sleep study."  R. 376.  In the second form, Dr. Pineless wrote in the remarks section as follows: "Patient's narcolepsy not well controlled.  If it becomes controlled, he should be able to be employable, although it would be preferable not to have patient around heavy machinery.  Driving should be at a minimum (if controlled)."  R. 378.

On May 7, 2003, Reginald Bowden, M.D., noted that Goodin had a positive Phalen's sign on his left wrist.[7] R. 457. He recommended use of a wrist splint. R. 456.

On December 18, 2002, Miguel Rivera Rivera, M.D., examined Goodin. Dr. Rivera noted that Goodin seemed to fall asleep two times during the interview, but he was easily aroused. Dr. Rivera observed that Goodin's coordination and fine manipulation were normal. His impression was that Goodin suffered from hypersomnolence-narcolepsy. R. 450-51. Dr. Rivera prepared an RFC form in which he opined that Goodin could only occasionally climb and balance and he had a limited ability to work around hazards such as machinery and heights. He had a limited ability to see. These are the only limitations Dr. Rivera noted. R. 454-55.

## IV.   STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(A). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or

---

[7] "The reproduction of the symptoms of carpal tunnel syndrome by hyperflexing the wrist." *Casher v. Halter*, No. Civ.A. 00-0110-AH-L, 2001 WL 394921, at *5 n.4 (S.D. Ala., Mar. 29, 2001).

her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

>(1) Is the claimant presently unemployed?
>
>(2) Is the claimant's impairment severe?
>
>(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
>(4) Is the claimant unable to perform his or her former occupation?
>
>(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

This Court's review of a final decision by the SSA is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987)(quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.      ANALYSIS.**

Goodin argues that the ALJ did not consider the effects of his sleeping episodes in combination with his other impairments. He asserts that the ALJ erred by failing to give great weight to Dr. Pineless's conclusion that Goodin could work zero to one hours a day, could not operate foot controls, climb, work around machinery or drive an automobile due to narcolepsy. He also submits that the ALJ did not properly judge his credibility. These are the only issues I will address.[8]

---

[8] Goodin also argued that remand was required because a portion of the transcript was inaudible. I addressed this argument in footnote 5, *supra*.

-13-

*A.     Consideration of Impairments in Combination.*

The argument that the ALJ failed to consider all of Goodin's impairments in combination is belied by the ALJ's decision. The ALJ reviewed all of the medical records, including records concerning Goodin's sleep disorder, vision problems, and complaints of joint pain. He found that Goodin had narcolepsy, a history of traumatic injury of his right eye and early osteoarthritis. He concluded based on the review of the record and his findings regarding Goodin's impairments that Goodin had "an impairment or combination of impairments considered 'severe' based on the requirements in the [SSA] Regulations . . . ." R. 425J. Thus, the ALJ did not err by failing to consider Goodin's impairments in combination.

*B.     Credibility.*

Goodin also argues that the ALJ did not appropriately judge his credibility regarding his sleeping episodes and related issues regarding the effects of medication. "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (internal citations omitted).

In the present case, the ALJ articulated specific reasons for finding Goodin's testimony to be not fully credible, which reasons are supported by substantial evidence in the record. The ALJ stated that Goodin had a "documented favorable response to medication with no significant changes in his medical regimen for many years." R. 425H. The record, summarized by the ALJ and in the statement of facts above, reflects that at

-14-

least since 1994, Goodin had been treated with Dexedrine and before that with Ritalin. Physicians varied the dosage of the medication from time to time as necessary to address Goodin's sleeping episodes. Indeed, from time to time Goodin reduced his dosage of Dexedrine because he was having fewer sleeping episodes or, in the early years, refused to take the medication altogether. As of October 2002, treatment notes reflect that Goodin's condition was well controlled with Dexedrine.

Because the ALJ articulated explicit and adequate reasons for finding Goodin's testimony to be not fully credible, and the reasons are supported by substantial evidence in the record, the ALJ did not err in judging Goodin's credibility.

C.   *Reliance on Opinion of Treating Physicians.*

Goodin contends that the ALJ erred by failing to give great weight to Dr. Pineless's functional capacity assessment, particularly with respect to the opinion that Goodin could work zero to one hour a day and that climbing could be dangerous. Dr. Pineless was one of Goodin's treating physicians. As such, his opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] *. . .* [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted). The ALJ must articulate the reasons for giving less weight to the opinion of the treating physician. *Id.*

In this case, the ALJ credited Dr. Pineless's observation that if Goodin were "compliant with treatment and medication he would be able to be gainfully employed. . . ."

R. 425H. As discussed above, the ALJ found that Goodin's sleeping episodes were controlled by medication, when he used it consistently and as prescribed. This was sufficient "good cause" to reject the portion of Dr. Pineless's opinion that was based on the assumption that Goodin's narcolepsy would not be well controlled.

With respect to postural limitations on the ability to climb, Goodin is correct that the ALJ did not explain why he did not include that restriction in his RFC determination. The omission is harmless, however, because the ALJ included in his hypothetical question to the VE both postural limitations and vision limitations. Even with these limitations, the VE opined that there were jobs available that Goodin could perform. Under these circumstances, the ALJ did not err in the weight he gave to the opinion of Goodin's treating physician.

## VI. CONCLUSION.

For the foregoing reasons, it is **ORDERED** that the decision of the SSA is **AFFIRMED**. The Clerk of Court is directed to issue a judgment affirming the decision of the Commissioner of Social Security and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 22, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties